IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.S. and B.S. as guardian and parent of T.S., G.S. and N.S., | CASE NUMBER: 08-30 |
| Plaintiffs, | JUDGE KIM R. GIBSON |
| v. | |
| SOMERSET COUNTY, SOMERSET COUNTY CHILDREN AND YOUTH SERVICES, JESSICA ELLER, JULIE BARTH, and E.N., | ***ELECTRONICALLY FILED*** |
| Defendants. | **JURY TRIAL DEMANDED** |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, SOMERSET COUNTY, SOMERSET COUNTY CHILDREN AND YOUTH

SERVICES, JESSICA ELLER and JULIE BARTH, file the within Brief in Support of their Motion

for Summary Judgment as follows:

### I.  QUESTIONS PRESENTED

A.  SHOULD SUMMARY JUDGMENT BE ENTERED FOR THE INDIVIDUAL DEFENDANTS BECAUSE THEY ARE ENTITLED TO ABSOLUTE AND QUALIFIED IMMUNITY FOR ALL OF THE PLAINTIFFS' STATED CLAIMS?

**Suggested Answer: Yes.**

P0896476.1

B.   SHOULD SUMMARY JUDGMENT BE ENTERED AS TO THE
     PLAINTIFFS' CLAIMS AGAINST SOMERSET COUNTY AND
     SOMERSET COUNTY CYS BECAUSE THERE IS NO EVIDENCE
     OF RECORD OF ANY UNCONSTITUTIONAL CUSTOM, POLICY
     OR PRACTICE AND NO RESPONDEAT SUPERIOR LIABILITY
     CAN EXIST? ?

     **Suggested Answer: Yes.**

C.   SHOULD SUMMARY JUDGMENT BE ENTERED AS TO THE
     PLAINTIFFS' DUE PROCESS AND FIRST AMENDMENT
     VIOLATION CLAIM BECAUSE ALL EVIDENCE DEVELOPED
     DEMONSTRATES THAT THE DEFENDANTS ACTED
OBJECTIVELY REASONABLY IN ALL RESPECTS

     **Suggested Answer: Yes.**

## II.   RELEVANT FACTS OF RECORD

The relevant facts are set forth in Defendants' Concise Statement of Undisputed Material

Facts, which is filed contemporaneously herewith.  The relevant facts are incorporated herein by

reference.

## III.   ARGUMENT

### Standard applicable to Motions for Summary Judgment.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c).  If the non-moving party has the burden of persuasion at trial, the party moving for

summary judgment may meet its burden by showing that the evidentiary materials of record, if

reduced to admissible evidence, would be insufficient to carry the non-moving party's burden of proof at trial.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322 (1986).

Once the moving party has demonstrated to the court that there is an absence of evidence to support the non-moving party's case, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  Summary judgment is proper unless the record contains sufficient evidence favoring the non-moving party to enable a <u>reasonable</u> jury to return a verdict for that party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-250 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."); <u>accord</u>, <u>Equimark Commercial Finance Co. v. C.I.T. Financial Service Corp.</u>, 812 F.2d 141, 144 (3d Cir. 1987).


A.   **JESSICA ELLER AND JULIE BARTH ARE ENTITLED TO BOTH ABSOLUTE IMMUNITY AND QUALIFIED IMMUNITY FOR ALL OF PLAINTIFFS' CLAIMS.**

1.   **<u>ABSOLUTE IMMUNITY</u>**

The Third Circuit has held that CYS caseworkers "are entitled to absolute immunity for their actions in petitioning, and in formulating and making recommendations to the state court." <u>Ernst v. Child and Youth Services of Chester County</u>, 108 F.3d 486, 493 (3d. Cir. 2007); <u>Bowser v. Blair County Children and Youth Services</u>, 346 F. Supp.2d 788 (W.D. Pa. 2004) (Gibson, J.).   This immunity includes "acting as an advocate in judicial proceedings" and "is broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings."

Ernst, 180 F.3d at 495. It does not encompass "'investigative or administrative functions outside the context of a judicial proceeding.'" Ernst, 180 F.3d at 497 n.7 (quoting Snell v. Tunnell, 920 F.2d 673 (10th Cir. 1990) (holding that pre-adjudicatory investigative activities by child welfare workers are entitled only to qualified immunity).

The Third Circuit explained that public policy supports absolute immunity for such child welfare workers because their actions are closely analogous to those of prosecutors. Ernst, 180 F.3d at 496. As the Third Circuit explained, "[c]ertainly, we want our child welfare workers to exercise care in deciding to interfere in parent-child relationships.  But we do not want them to be so overly cautious, out of fear of personal liability, that they fail to intervene in situations where children are in danger." Id. (citations omitted). "[A]lternative mechanisms other than the threat of §1983 liability protect the public against unconstitutional conduct by child welfare workers. First, the judicial process itself provides significant protection."  Ernst, 180 F.3d at 497.

Turning to the facts of this case, it is clear that plaintiffs' claims against Ms. Eller and Ms. Barth are barred by absolute immunity.

a.       **The defendants are absolutely immune for seeking an ex parte order following Dr. Lindblad's report of suspected abuse.**

Part of plaintiffs' contention is that Ms. Eller and Ms. Barth violated plaintiffs' civil rights by pursuing the emergency ex parte order of court of May 5, 2006. These claims are clearly barred by the absolute immunity enjoyed by the caseworker defendants.

Initially, it should be noted that there is no dispute that Dr. Lindblad made a report of suspected abuse to the Pennsylvania ChildLine, alleging that the child suffered from a psycho-social failure to thrive.  Further, Dr. Lindblad clearly stated that  he had a reasonable suspicion that M.N.'s failure to thrive was the result of child abuse or neglect and that B.S. was the individual responsible for the abuse or neglect.  Ms. Eller made her ChildLine report based upon the re-diagnosis made by Dr. Lindblad.  Following the ChildLine report made by Ms. Eller, Dr. Lindblad made his own ChildLine report.

It is significant that Dr. Lindblad's report in this regard was mandated by Pennsylvania law, which provides "[p]ersons who, in the course of their employment, occupation or practice of their profession, come into contact with children shall report . . . when they have reasonable cause to suspect, on the basis of their medical, professional or other training or other training and experience, that a child coming before them . . . is an abused child." 23 Pa. C.S.A. §6303(a).  Physicians are specifically required to make such reports. 23 Pa.C.S.A. §6303(b).

When such a report of abuse is received, the Department of Public Welfare is statutorily mandated to forward the report to the appropriate county Children and Youth Service for investigation. Id. §6334(a).  Upon receipt of such a report, CYS is required to conduct and immediate investigation. Id. §6368(a).

Therefore, because Dr. Lindblad suspected that  M.N. suffered from a psycho-social failure to thrive as a result of abuse or neglect by plaintiff caused by Munchausen Syndrome by Proxy, he

was required to report it to the Department of Public Welfare, who was required to refer it to Somerset County Children and Youth Services, who was required to investigate. In other words, the mandates of state law were followed in this case and dictated the very actions taken.

Seeking the May 5, 2006 ex parte court order cannot support liability in any case. Requesting such an order is "petitioning" the court, and providing any testimony constitutes "making recommendations to the state court" and/or "acting as an advocate in judicial proceedings" for which Ms. Eller and Ms. Barth are absolutely immune. Ernst, 108 F.3d at 493 (3d. Cir. 2007). Plaintiffs' claims arising from Ms. Eller and Ms. Barth's actions in seeking the May 5, 2006 order cannot support a claim upon which relief may be granted, and must be dismissed.

b.    **The defendants are absolutely immune from plaintiffs' claim that the defendants improperly brought the state court action under the CPSL as opposed to the Juvenile Act**.

Ms. Eller and Ms. Barth are also immune for their purported decision to use the Child Protective Services Law as opposed the Juvenile Act in this case. Plaintiffs suggest that this decision was made for the purpose of taking her child away with less due process. The Complaint suggests that this decision "avoided the role they have under state law under the Juvenile Act and the Child Protective Services Law to justify the suspension of parental custody rights in a fair judicial proceeding." (Amended Complaint at ¶75).

In fact, the CPSL provided the only framework to address the case.  Regardless of whether Dr. Lindblad's judgement as to whether M.N.'s failure to thrive was the result of abuse or neglect was correct, the undeniable fact remains is that he did make that report and advised CYS of his diagnosis and intent to make the report. As noted above, the CPSL mandates investigation of such a report.  There is no basis in Pennsylvania law or under these facts to choose between the mandates of the CPSL or to instead initiate custody proceedings under the Juvenile Act.

Further, caseworkers are absolutely immune from such a claim. Even if the caseworkers were afforded a choice of proceeding under the CPSL or the Juvenile Act, such a decision would constitute formulation of recommendations to the court or petitioning the court for which they are entitled to absolute immunity. See Ernst, 108 F.3d at 493 (3d. Cir. 2007).  Indeed, this would be analogous to a prosecutor deciding which charges to pursue against a criminal defendant.  Plaintiff's theory in this regard fails to state a claim upon which relief may be granted.

c.     **The defendants are absolutely immune from suit for presenting Dr. Lindblad's report to the state trial court.**

Plaintiffs also claim that the defendants violated their civil rights by presenting the state court with Dr. Lindblad's allegedly "false" report of suspected abuse or neglect. This is implied in paragraphs 63 and 73, which suggests that Ms. Eller's report to the court was "false" because Eller was also aware of some additional medical information showing that M.N. was gaining weight. Amended Complaint ¶ 64 (substantive due process claim); ¶73 (procedural due process claim).

The alleged failure to consider additional medical evidence cannot support a claim in this case.  In Bowser v. Blair County Children and Youth Services, 346 F. Supp.2d 788 (W.D. Pa. 2004), this Honorable Court noted that an evaluation and consideration of evidence to be presented to a state judge is entitled to absolute immunity because it constitutes "preparing for" and "initiating" judicial proceedings.  Bowser, 346 F.Supp.2d at 793-94.  While plaintiffs may believe that the evidence commanded a different result, the law does not permit claims for making such reports to a court.  This is precisely the reason for the absolute immunity enjoyed by caseworkers in such situations.  Every investigation conducted by CYS workers following the receipt of a report of suspected abuse or neglect requires a myriad of "judgment calls," just as any prosecutor is faced with such decisions.  The federal courts have demonstrated through their opinions, as set forth above, that caseworkers should not be hamstrung in their duties by a concern or fear of possible civil liability for making these difficult decisions.

Upon examination, the facts of the instant matter provide a perfect framework for understanding the federal court's hesitation in imposing civil liability upon caseworkers.  Here, CYS became involved with M.N. upon the self-referral of plaintiff, B.S. in December of 2005.  Upon the initiation of the assessment of the case, it became apparent to the CYS employees that M.N. was significantly underweight for her age.  In fact, the December 7, 2005 request made by B.S. sets this out explicitly.  Accordingly, it became incumbent upon the CYS employees to follow through with this assessment.

Between the date of the referral and May 5, 2006, the CYS employees appropriately followed M.N.'s medical progress. Of particular importance given her failure to thrive was following with the physician primarily responsible for treating that condition, Dr. Lindblad. It is undisputed that by April 18, 2006, Dr. Lindblad had begun to suspect that M.N.'s failure to thrive was the result of an environmental condition to which M.N. was exposed and that condition was present in the home. Accordingly, Dr. Lindblad re-diagnosed M.N. with psysho-social failure to thrive. Dr. Lindblad arrived at this diagnosis only after having conducted exhaustive diagnostic testing in order to determine if an organic cause existed. Dr. Lindblad ruled out such causes.

Perhaps most significant to Dr. Lindblad was the fact that when M.N. was removed from the exclusive custody of B.S., her condition improved in terms of her ability to gain catch-up weight. While M.N. was admitted to the Children's Institute in March, 2006, for the very first time during Dr. Lindblad's treatment of M.N., she demonstrated catch-up weight and gained 50 grams per day. Immediately after her discharge from the Children's Institute and her return to the primary custody of B.S., not only did M.N. cease gaining catch-up weight, she actually was gaining less weight than would be expected of a child who was not suffering from failure to thrive. The importance of this to Dr. Lindblad was clear and cannot be underestimated.

In early May, 2006, this is the information with which Ms. Eller and Ms. Barth were confronted. M.N.'s treating pediatric gastroenterologist had determined that M.N.'s failure to thrive was caused by some non-organic factor. Dr. Lindblad had further determined that B.S. was the specific cause of M.N.'s failure to thrive. In fact, Dr. Lindblad was convinced enough to indicate

to CYS that a ChildLine referral for suspected abuse and/or neglect was indicated and that Dr. Lindblad was going to make that report.

Plaintiffs would have this Court impose liability upon the CYS workers despite the above facts. In essence, plaintiffs contend that the caseworkers should be civilly liable for not ignoring the diagnosis of Dr. Lindblad and substituting their own medical conclusions as to the cause of M.N.'s failure to thrive. Of course, such a conclusion is ludicrous and provides abundant rationale as to why the federal courts have found CYS employees to be absolutely immune from civil liability for making such judgment calls. As stated, this case provides an ideal factual framework to understand both the reason and need for such absolute immunity and, accordingly all of the plaintiffs claims against Julie Barth and Jessica Eller should be dismissed with prejudice.

## 2.    **QUALIFIED IMMUNITY**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The purpose of qualified immunity is to limit the deleterious effects that the risk of civil liability would otherwise have on the operations of government. Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir. 1995). A public official loses his qualified immunity and becomes subject to liability only when he acts in a manner which is not "objectively reasonable"

under the circumstances. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In this action, no facts have been developed which would support a conclusion that any of the individual CYS workers acted in a manner which was not objectively reasonable. To the contrary, as set forth immediately above, the facts lead to the undeniable conclusion that the caseworkers actions were not only reasonable but appropriate. The CYS workers were in possession of information that M.N.'s treating physician not only believed that her failure to thrive was caused by environmental factors as opposed to a medical condition, but also that Dr. Lindblad believed that B.S. was deliberately causing M.N. to not gain weight.

Further, the empirical evidence supported Dr. Lindblad. Most significantly, the only time during CYS's involvement and Dr. Lindblad's treatment of M.N. that she demonstrated the ability to gain the anticipated "catch up weight" was when B.S. was not primarily responsible for feeding M.N. This was during the one week in-patient evaluation at the Feeding Institute. Once M.N. was discharged from the Feeding Institute, her failure to gain weight at an appropriate rate returned. Confronted with these undeniable facts and with Dr. Lindblad's diagnoses and ChildLine report, the actions of CYS and its employees were not only reasonable and warranted, they were precisely what the law required.

In fact, a better argument could be made that had the CYS workers acted in any way other than that which they did, then their actions would have been unreasonable. Plaintiffs would ask this

Court to find that the actions of the CYS workers in removing M.N. from an environment and from the custody of a person that M.N.'s physician had determined was causing immediate and significant harm to the child was objectively unreasonable.  Surely the law cannot support such a conclusion. Rather, had the CYS workers ignored the medical diagnosis of Dr. Lindblad, done nothing, and further harm would have befallen M.N., that decision may have proven to be objectively unreasonable.  In this case, when confronted with a choice as to how to protect M.N. from on-going harm, Ms. Eller and Ms. Barth acted prudently, decisively, and, most important, reasonably.

**B      THE FACTS DEVELOPED CANNOT SUPPORT A CAUSE OF ACTION THROUGH 42 U.S.C. § 1983 WHERE THERE ARE NO ALLEGATIONS OF ANY UNCONSTITUTIONAL CUSTOM, POLICY OR PRACTICE AND RESPONDEAT SUPERIOR LIABILITY CANNOT EXIST.**

"A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dept. of Social Services, 436 U.S. 658, 694 (1978).  Section 1983 municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)(quoting Monell, 436 U.S. at 694).  To succeed on a § 1983 claim, a plaintiff must show that the municipality "maintained a policy or custom that caused a deprivation of his constitutional rights." Doby v. DeCrescenzo, 171 F.3d 838, 867 (3d Cir. 1999).

Plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of the constitutional right at issue. A policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990), quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 481 (1986). Custom can be established by a showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well- settled and permanent as to virtually constitute law. <u>Bielevicz</u>, 915 F.3d at 850. In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, to the custom and that as a result of policy or custom, they have suffered a constitutional deprivation.

In this case, plaintiffs would seem to conclude that Somerset CYS, through its employees, committed a constitutional deprivation because they investigated reports of abuse and/or neglect and then took the indicated action. This position is untenable. Somerset CYS is created and controlled by statute in the Commonwealth of Pennsylvania. 55 Pa. Code 3130.12. The statutory purpose of CYS *is* to protect children within the Commonwealth. Children and Youth agencies are governed by regulations of the Department of Welfare and are subject to Department of Welfare review and certifications. All children and youth agencies within the Commonwealth of Pennsylvania are governed by DPW regulations and are required to obtain licensures and certifications. 55 Pa. Code § 3130, <u>et seq.</u>; 62 P.S. § 2205; 62 P.S. §§ 701-704.

Investigation and handling of ChildLine referrals or allegations of abuse within the Commonwealth are the responsibility of the statutorily created children and youth agencies. 55 Pa. Code §168.5. Child welfare agencies are mandated by law to follow established guidelines for conducting abuse investigations and insuring the safety of children. 55 Pa. Code § 3140.11; 55 Pa. Code § 3150.12; 55 Pa. Code § 3490.3. Specifically, § 3490.55 provides that a child, the subject of an abuse referral, must be seen within 24 hours. Section § 3490.55(a). That caseworker must make contact with the child to determine the incident of abuse. Section 3490.55(d). The alleged perpetrator is to be notified of the ChildLine referral. An assessment caseworker is then to investigate the allegations of abuse and to determine whether or not the allegations rise to the statutory definition of abuse. The caseworker must complete the investigation to "indicated", "founded", unfounded", or open the case for services.

Contrary to plaintiffs' apparent position, a  children and youth agency does not have discretion in investigating a ChildLine referral of abuse. On the contrary, a children and youth agency is statutorily required to conduct an investigation as outlined by the applicable statutes. Investigations conducted by Someset CYS and its caseworkers in this case were not only appropriate but in accordance with the mandated regulations.

In this case, the essence of plaintiffs' claim  is that some policy, practice or custom of Somerset County CYS does not meet constitution muster is set forth in the Amended Complaint at paragraph 69. Therein, plaintiffs alleged that "it is the policy, practice, and procedure of Somerset County CYS to approach judges and seek to transfer custody in cases when reports of abuse or

neglect are received and there is a pending custody case between parents who are separated."

(Amended Complaint, ¶ 69). In essence, the plaintiff's entire claim seems to rest upon plaintiff's

belief that the Somerset CYS and the employees were somehow attempting to assist the plaintiff's

estranged spouse in a custody proceeding to his detriment. Even if this could somehow be believed,

it does not establish a custom or policy upon which a § 1983 claim could be based. The advent of

the abuse referrals to CYS and its statutorily created duty as a children and youth agency in the

Commonwealth to investigate the regulations is fatal to any effort by plaintiff to attempt to turn her

dissatisfaction with being the subject of referrals into a § 1983 based cause of action.

The plaintiffs will be unable to point to one piece of evidence in this case which would

establish a policy, practice or custom of Somerset CYS which does not comport with constitutional

requirements. Rather, the policies of CYS comply with the dictates of the statutes and regulations

under which CYS was created and, as such, the claims against the governmental entities must be

dismissed.

## C.   PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE SUFFICIENT FACTS TO ESTABLISH THE CLAIMED VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SHOULD BE DISMISSED.

### 1.   Substantive Due Process and First Amendment Claims

It is well settled in our circuit that the parents' First Amendment liberty interests in familial

integrity are limited by the state's interest in preventing children from abuse. Croft v. Westmoreland

County Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997). Because the First Amendment and Substantive Due Process claims are interwoven, they will be addressed together.

Croft involved a county social worker who received an abuse report from an anonymous caller. After interviewing the alleged perpetrator, who denied any abuse, the caseworker allegedly gave the father an ultimatum to separate himself from the alleged child victim or the child would be taken away and placed in foster care. In its analysis as to whether his substantive due process rights were violated, the Third Circuit balanced the parents' fundamental interest with the state's interest to protect children from abuse, holding:

> The due process clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process. In determining whether the Crofts' constitutionally protected interests were violated, we must balance the fundamental liberty interests of the family unit with the compelling interests of the state in protecting children from abuse.

Croft, 103 F.3d at 1125.

Accordingly, the Court stated that:

> Our focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the Crofts' rights as Chynna's parents. Absence such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power.

Croft, 103 F.2d at 1126.

The court noted that a child abuse investigation does not in and of itself constitute a constitutional deprivation, but such a deprivation can occur where there is no "reasonable and articulable evidence "giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." The Croft court held: "[t]he right to familial integrity, in other words, does not include a right to remain free from child abuse investigations." Croft, 103 F.3d at 1125.

More recently, the Western District of Pennsylvania has applied the Croft analysis in Patterson v. Armstrong County Children and Youth Services, 141 F.Supp.2d 512 (W.D.Pa. 2001). In Patterson, on November 6, 1998, the plaintiff and her daughter had a fight at home. Patterson, 141 F.Supp.2d at 515. Thereafter, the plaintiff drove her daughter to her high school and left her there for the school day. Id. While at the school, the daughter informed the guidance counselor of the events of that morning and showed the guidance counselor various scrapes and bruises. Id. School officials met on the matter and decided to report it to Armstrong County Children and Youth Services. Patterson, 141 F.Supp.2d at 516. A representative of Armstrong CYS appeared at the school and contacted the local police department. Throughout the day, the police department, CYS officials, and school officials consulted on the matter, ultimately deciding that the daughter should not return home with the mother that afternoon. Id. The daughter was taken into protective custody under the Juvenile Act by the responding police officer, who then immediately or even simultaneously, transferred custody to CYS. Patterson, 141 F.Supp.2d at 517.

While this was transpiring, the mother appeared to pick the daughter up from school. Id. She was advised of the involvement of the police and CYS and asked to give a statement. Id. She

refused to do so until her attorney arrived. Id. The officials decided not to wait for the mother's attorney and took the daughter from the school. The CYS official took the daughter to the local district justice office to obtain a PFA against the mother and then took her to her father's residence. Criminal charges were also filed against the mother for assault. Id.

On November 9, 1998, the father took the daughter to get another PFA. Id. This was necessitated by the fact that he original PFA was ineffective because it was in the daughter's name and, as a minor, she was not entitled to secure one. Id. The father obtained a PFA in his name as the daughter's guardian.

On November 18, 1998, the father withdrew the second PFA. Patterson, 141 F.Supp.2d at 518. On November 23, 1998, criminal charges were withdrawn. Id. Also on that date, Children and Youth Services were provided information from Grove City Hospital that, following examination of the daughter, it was determined that she sustained no serious injuries and, therefore, the abuse charges were determined to be unfounded. Id. Accordingly, at that time, the daughter was free to return to the mother's care. Id.

Applying the Croft standard, the Court found that the substantive due process rights of the mother were not violated. As the Court stated, citing Croft, "[t]he state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in eminent danger of abuse." Patterson, 141 F.Supp.2d at 521, quoting Croft, 103 F.3d at 1126. The Court focused on, "[w]hether the

information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the parents' rights as the child's parents." Id.

This standard was further developed and clarified in Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir. 1999). Miller involved claims for the deprivation of substantive and procedural due process by a mother and her three children against Philadelphia and the Department of Human Services for removing the children from the family without probable cause. The Miller Court recognized that the parents had a fundamental liberty interest in the care, custody and management of their children. The Court also found that this interest had to be balanced against the state's interest in protecting the children. The Court also found that, "[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." Miller v. City of Philadelphia, 174 F.3d 368, 375. Under this standard, governmental action will not expose an official to liability unless it is, "so ill-conceived or malicious that it 'shocks the conscience.'" Id.

Applying this standard to the Patterson case, the Court held, that the conduct of the CYS workers did not even rise to a level of "questionable, but not conscience shocking" conduct as in the Miller case. Patterson, 141 F.Supp.2d at 522. Further, the Court definitively stated that "it certainly does not rise to the level of arbitrariness seen in Croft, which did shock the conscience." Patterson, 141 F.Supp.2d at 522. Accordingly, the Patterson court granted summary judgment to the defendant on the plaintiff's claims of a deprivation of substantive due process rights under the Fourteenth Amendment.

Further, in order to establish a Fourteenth Amendment due process claim, the plaintiff must state sufficient facts to show that the egregious conduct "shocks the conscience." A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 579 (3d Cir. 2004). "Negligent conduct is never egregious enough to shock the conscience, but conduct intended to injure most likely will rise to the level of conscience-shocking." A.M., 372 F.3d at 579.

For liability to attach under a § 1983 claim challenging a social worker's decision, "the standard of culpability for substantive due process must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience." Ziccardi v. City of Philadelphia, 288 F.3d 57, 64 (3d Cir. 2002)(quoting Miller, 174 F.3d at 375-376).

Applying the above holdings, the unmistakable conclusion is that the defendants are entitled to summary judgment in this case. As the Croft and Patterson courts made clear,  it is the information available to the CYS workers at the time of the decision which will determine if there was an "objectively reasonable suspicion of abuse justifying the degree of interference with the parents' rights as the child's parents."  Again, on May 5, 2006, Ms. Barth and Ms. Eller had information from M.N.'s treating physician not only that M.N. was suffering from failure to thrive, but that the condition was being caused by the custodial parent, B.S. The suspicion of Dr. Lindblad was significant enough that he believed he was statutorily required to make a ChildLine report of his suspicion of the abuse and/or neglect by B.S.

Ms. Barth and Ms. Eller were not in possession of unsubstantiated allegations of abuse from

an anonymous source. They were not presented with undocumented claims from an estranged parent

or spouse. They were not between two parents in a "he said, she said" type of situation. They were

given direct information from the child's doctor who was treating her for the very condition that gave

rise to his suspicion of abuse. They were advised by Dr. Lindblad that he believed that B.S. was the

perpetrator of the abuse and neglect. Dr. Lindblad came to this conclusion only after months of

treatment of M.N. and only after conducting multiple diagnostic tests of M.N. to rule out other

causes. Under these circumstances and in possession of this information, it is impossible to reach

any conclusion other than that an objectively reasonable suspicion of abuse existed which would

not only justify, but require, the interference with B.S.'s parental rights. This information also

demands the dismissal of the substantive due process and First Amendment claims.


### 2.    Procedural Due Process

The United States Court of Appeals for the Third Circuit explained the applicable law for a

due process claim as follows:

> "The fundamental requirement of due process is the
> opportunity to be heard at a meaningful time and in a
> meaningful manner." Mathews v. Eldridge, 424 U.S.
> 319 (1976)(quoting Armstrong v. Manzo, 380 U.S.
> 545 (1965). Assessing whether due process has been
> given involves a weighing of the factors set forth by
> the Supreme Court in Mathews:
>
> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the

> Government's interest, including the function
> involved and the fiscal and administrative burdens
> that the additional or substitute procedural
> requirement would entail.

Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999).

In order to prove a claim premised upon a violation of procedural due process, a plaintiff must prove that he or she was deprived of a constitutionally protected liberty interest without the benefit of constitutionally required procedures.  Mathews, 424 U.S. at 334-335.

In the case at issue, plaintiffs have failed to come forward with evidence which would support a conclusion that B.S. did not receive the constitutionally required process. Preliminarily, the statutory procedures for abuse investigations were followed with the ChildLine referrals, and the conduct of the CYS and caseworkers was not only mandated by law but performed in a reasonable manner.  Once the referral was received, CYS secured an Order from Judge Cascio which was appropriate under the circumstances. Further, on June 14, 2006, B.S. received a hearing on a Petition for Writ of Habeas Corpus which flowed from the Order of Judge Cascio.  That Petition was denied by Judge Cascio on June 26, 2006.  Plaintiffs' claim that no hearing was held on the issues which resulted in the transfer of custody of M.N. to E.N. is simply without merit.

It is anticipated that plaintiffs will argue that the Summary and Order procedure that Somerset CYS utilized in this matter is inherently in violation of procedural due process requirements.  There has been no decision of any Court to that effect, however.  Certainly, there is

nothing to suggest that the CYS workers who employed the Summary and Order procedure did so with knowledge that it did not comply with Constitutional requirements nor that they should have known that the procedure was improper.

Additionally, plaintiffs' attempted apparent arguments that CYS failed to pursue statutory dependency proceedings or otherwise improperly separated B.S. from M.N. are of no consequence to the procedural due process claim.  First, there was no reason to seek dependency proceedings because the natural father was available and willing to provide appropriate care for M.N.  There was simply no basis to file a dependency petition because there was no reason to believe that M.N. was dependent.  Further, it is of no small moment that the habeas corpus petition was ultimately denied.

Further, although B.S. had initiated proceedings to have her status as the indicated perpetrator of abuse expunged, B.S. ultimately voluntarily terminated those proceedings.  Additionally, B.S. and E.N. have been involved in a custody action involving M.N. which is on-going.   Despite that on-going litigation, the custody of M.N. remains essentially unchanged from that which existed on May 5, 2006.

Important to the analysis as to whether relief can be had for a violation of the procedural due process rights of the plaintiff is the case of Brown v. Daniels, 290 Fed. Appx. 467, issued by the Third Circuit Court of Appeals. In Brown, the minor-child was taken to CYS by the maternal aunt because of concerns of abuse by the stepfather. The CYS caseworker initiated an investigation and attempted to contact the parents by phone and followed up with letters to each of them the following

week explaining that the minor was residing with the material grandmother and that, "A plan for

guardianship or custody needs to be decided as soon as possible in order to resolve the matter." The

initial contact with CYS occurred on May 21, 2003. A hearing was set for June 25, 2003,

approximately four weeks later. The hearing was postponed on one occasion and was finally held

on July 9, 2003. Following the hearing, the juvenile court directed the family to begin counseling

and ordered that the child remain with the grandmother under the "protective supervision" of CYS.


Initially, the matter was dismissed for failure to state a claim. The matter was appealed and

the Third Circuit affirmed the dismissal of the substantive due process claims but vacated and

remanded to the district court with respect to the procedural due process rights. The matter went to

trial and, upon oral motion of the defendant, judgment as a matter of law, was granted. The Court

did not address the issue of the promptness of the hearing. Rather, the Court held:

> In order to prevail on a § 1983 claim where a "prompt" post-
> deprivation hearing was not conducted after the removal of a child,
> a plaintiff must establish, "with some degree of probability" that the
> timely hearing would have prevented the extended infringement on
> their familial rights. In other words, the plaintiff must demonstrate
> actual damages resulting from the delay in the post-deprivation
> hearing.

Brown, 290 F.Ed. Appx. at 473, citing and quoting Berman v. Young, 291 F.3d 976, 985 (7th Cir.

2002).


The significance of the Brown decision is obvious. Regardless of the position of plaintiffs

as to the sufficiency of the process granted in the deprivation of B.S.'s parental rights, plaintiffs must

also demonstrate that such process would have borne a different result. Given that despite the

institution of habeas corpus proceedings and the on going custody action that the custody of M.N. remains with E.N., plaintiffs simply cannot prevail in that no process would have had any different result.  Accordingly, the procedural due process claims of plaintiffs merit dismissal.

## CONCLUSION

For all these reasons, summary judgment should be entered in favor of the defendants and against the plaintiff.  There is absolutely no evidence of wrongdoing either by Ms. Eller, Ms. Barth or Somerset CYS in this case.  In all respects, the defendants acted reasonably and according to law. This frivolous lawsuit should be dismissed via summary judgment at this time.

**JURY TRIAL DEMANDED**

Respectfully submitted,

MEYER, DARRAGH, BUCKLER, BEBENEK & ECK, P.L.L.C.

By:     s/Marie Milie Jones
        MARIE MILIE JONES, ESQUIRE
        PA I.D. #49711

        U.S. Steel Tower, Suite 4850
        600 Grant Street
        Pittsburgh, PA  15219
        Phone:  (412)  261-6600
        Fax:  (412)  471-2754
        E-Mail: mjones@mdbbe.com

        *Counsel for Defendants,*
        SOMERSET COUNTY, SOMERSET
        COUNTY CHILDREN AND YOUTH
        SERVICES, JESSICA ELLER and
        JULIE BARTH

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within has been served upon all parties either individually or through counsel by:

|          | Hand-Delivery |
|----------|----------------|
| _____ | Hand-Delivery |
| _____ | First-Class Mail, Postage Prepaid |
| _____ | Certified Mail-Return Receipt Requested |
| _____ | Facsimile |
| _____ | Overnight Mail |
| ___X___ | Electronic Service |

at the following addresses:

Edward A. Olds, Esquire
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
*(Counsel for Plaintiffs)*

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.

Dated:__March 15, 2010___        _s/Marie Milie Jones_____
MARIE MILIE JONES, ESQUIRE
JEFFREY COHEN, ESQUIRE
*Counsel for Defendants,*
SOMERSET COUNTY, SOMERSET COUNTY
CHILDREN AND YOUTH SERVICES, JESSICA
ELLER and JULIE BARTH

P0896476.1