IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| B.S. and B.S. as guardian and parent of T.S., G.S. and N.S., | CASE NUMBER: 08-30 |
| Plaintiffs, | JUDGE KIM R. GIBSON |
| v. | |
| SOMERSET COUNTY, SOMERSET COUNTY CHILDREN AND YOUTH SERVICES, JESSICA ELLER, JULIE BARTH, and E.N., | *ELECTRONICALLY FILED* **JURY TRIAL DEMANDED** |
| Defendants. | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

AND NOW, come the defendants, SOMERSET COUNTY, SOMERSET COUNTY CHILDREN AND YOUTH SERVICES, JESSICA ELLER, JULIE BARTH, by and through their counsel, Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., and, pursuant to L.R. 56.1.B.1, file the within Statement of Material Facts Not in Dispute in support of their Motion for Summary Judgment:

### BACKGROUND INFORMATION

1. Plaintiff, B.S., is the natural mother of M.N., a minor. (Amended Complaint, ¶ 2.)

2. The defendant, E.N., is the natural father of M.N. (Amended Complaint, ¶ 7.)

3. M.N. was born in June of 2004. (Amended Complaint, ¶ 9.)

4. E.N. and B.S. were living together at the time M.N. was born, but were not married. (Amended Complaint, ¶ 13.)

5. E.N. and B.S. subsequently separated with B.S. having primary custody of M.N. (Amended Complaint, ¶ 13.)

## MEDICAL HISTORY OF M.N.

6. Either at birth or shortly thereafter, M.N. came under the care of pediatrician Ajay P. Singh, M.D. and his practice. (Exhibit A to Appendix, Singh Deposition, p. 10).

7. M.N. was born with a tumor on her back, which was determined to be malignant. (Amended Complaint, ¶ 9.) (Exhibit A to Appendix, Singh Deposition, p. 13).

8. Thereafter, M.N. treated with chemotherapy for five months. (Amended Complaint, ¶ 10.)

9. At birth, M.N. weighed 9 lbs., 11 ozs. (Amended Complaint, ¶ 14.)

10. During infancy and thereafter, M.N. was slow to gain weight. (Amended Complaint, ¶ 15.)

11. Dr. Singh believes that the issue of poor weight gain or failure to thrive arose within the first six months to year of M.N.'s life. (Exhibit A to Appendix, Singh Deposition, p. 33).

12. Dr. Singh deferred to Children's Hospital to address M.N.'s failure to thrive. (Exhibit A to Appendix, Singh Deposition, p. 91).

13. Dr. Singh did not treat M.N. for failure to thrive as he understood the issue was being handled by Children's Hospital. ((Exhibit A to Appendix, Singh Deposition, p. 101).

14. At Children's Hospital, Douglas Lindblad, M.D., a pediatric gastroenterologist, treated M.N. (Exhibit B to Appendix, Lindblad Deposition, p. 12).

15. M.N. presented to Dr. Lindblad with a primary problem of failure to gain weight. (Exhibit B to Appendix, Lindblad Deposition, p. 179).

16. Dr. Lindblad diagnosed M.N. with failure to thrive in October of 2005. (Exhibit B to Appendix, Lindblad Deposition, p. 22).

17. From October, 2005, until March, 2006, Dr. Lindblad treated M.N. and gave various tests to search for a physical cause of the failure of M.N. to put on appropriate weight. (Exhibit B to Appendix, Lindblad Deposition, p. 177-8)

18. While in the custody of B.S., M.N. was unable to gain "catch-up" weight. Exhibit C to Appendix, Lindblad Report, p.2).

19. Catch-up weight is weight that a child would have been expected to gain plus additional weight which would get the child to the point where he or should be in terms of growth. (Exhibit B to Appendix, Lindblad Deposition, p. 176).

20. In March of 2006, Dr. Lindblad referred M.N. to Children's Institute of Pittsburgh to be treated as an in-patient. (Exhibit B to Appendix, Lindblad Deposition, p. 65).

21. M.N. was an in-patient at the Children's Institute for one week between March 20, 2006 and March 26, 2006. (Exhibit B to Appendix, Lindblad Deposition, p. 65).

22. Prior to the in-patient stay at the Feeding Institute, M.N. was gaining 8 to 11 grams per day. (Exhibit B to Appendix, Lindblad Deposition, p. 157).

23. During her stay in the Feeding Institute, M.N. gained 50 grams per day. (Exhibit B to Appendix, Lindblad Deposition, p. 157).

24. This gain during the in-patient stay demonstrated the expected "catch-up" weight. (Exhibit B to Appendix, Lindblad Deposition, p. 176).

25.     Following her discharge from the Children's Institute, M.N. again failed to gain appropriate weight, gaining only 4 grams per day. (Exhibit B to Appendix, Lindblad Deposition, p. 157; Exhibit C to Appendix, Lindblad Report, p.2).

26.     By contrast, during her period as an in-patient at the Children's Institute, M.N. gained 13 ozs. in six days, which reflected a gain of about 50 grams per day. (Exhibit B to Appendix, Lindblad Deposition, pp. 157; 176).

27.     During Dr. Lindblad's treatment, at no time other than the in-patient stay at the Children's Institute did M.N. demonstrate catch-up weight gain. (Exhibit B to Appendix, Lindblad Deposition, p. 176; Exhibit C to Appendix, Lindblad Report, p.2).

28.     Dr. Lindblad was troubled by the fact that M.N.'s weight gain away from home far exceeded her gain at home. (Exhibit B to Appendix, Lindblad Deposition, pp. 23-24).

29.     Dr. Lindblad performed extensive diagnostic testing in order to determine if an organic cause of M.N.'s failure to thrive existed. (Exhibit B to Appendix, Lindblad Deposition, pp. 177-178).

30.     Ultimately, Dr. Lindblad determined that the failure to thrive of M.N. was psycho-social (or non-organic) as opposed to organic in nature. (Exhibit B to Appendix, Lindblad Deposition, p.2).

31. Psycho-social failure to thrive is a condition in which the child's failure to thrive is due to some factors in the home that lead the child not to grow well, usually associated with inadequate caloric intake. (Exhibit B to Appendix, Lindblad Deposition, p. 94).

32. Dr. Lindblad concluded that M.N.'s "care at home is likely to be responsible for her failure to thrive." (Exhibit C to Appendix, Lindblad Report, p.2).

33. While M.N. was in the custody of B.S., she had gained 3.5 grams per day where as an average weight gain for a child of her age would have been between 7 and 9 grams per day. (Exhibit B to Appendix, Lindblad Deposition, p. 80).

34. Dr. Lindblad also became concerned that B.S. had Munchausen by Proxy Syndrome. (Exhibit C to Appendix, Lindblad Report, p.2).

35. Dr. Lindblad also believed that the risk to M.N. was posed by B.S. Exhibit B to Appendix, Lindblad Deposition, p. 67).

36. Dr. Lindblad believed that if M.N. remained in the care of B.S., she was not going to improve. (Exhibit B to Appendix, Lindblad Deposition, pp. 68-71).

37.     Dr. Lindblad believed that M.N. would not improve until she was removed from the care of B.S. (Exhibit B to Appendix, Lindblad Deposition, pp. 70-71).

38.     Dr. Lindblad discussed the re-diagnosis of psycho-social failure to thrive and his concerns regarding the possibility of Munchausen by Proxy with personnel at Somerset CYS, most likely Jessica Eller. (Exhibit B to Appendix, Lindblad Deposition, pp. 41-43; 160-162).

39.     Dr. Lindblad arrived at his diagnosis of psycho-social failure to thrive independent of any input from Somerset CYS. (Exhibit B to Appendix, Lindblad Deposition, p. 182).

40.     No one at CYS suggested to Dr. Lindblad that Munchause by Proxy was present in this matter. (Exhibit B to Appendix, Lindblad Deposition, p. 181).

41.     Dr. Lindblad decided to make a ChildLine report prior to discussing his re-diagnosis with anyone at CYS. (Exhibit B to Appendix, Lindblad Deposition, pp.162-163).

42.     Dr. Lindblad made his report to ChildLine because, on May 5, 2006, he had reasonable cause to suspect M.N. was a victim of some form of child abuse. (Exhibit B to Appendix, Lindblad Deposition, p. 181).

43.     Dr. Lindblad was not pressured by anyone at CYS to make his ChildLine report. (Exhibit B to Appendix, Lindblad Deposition, p. 182).

44.     Dr. Lindbland saw M.N. on August 29, 2006, at which time he discontinued caloric supplements. (Exhibit B to Appendix, Lindblad Deposition, p. 15).

45.     M.N. was discharged from Dr. Lindblad's care on January 9, 2007, at which time the failure to thrive had resolved. (Exhibit B to Appendix, Lindblad Deposition, p. 14).

## INVOLVEMENT OF SOMERSET CYS

46.     On December 2, 2005, B.S. made a Request for Services of Somerset CYS. (Request for Services of 12/2/05).

47.     According to the December 2, 2005 Request, B.S. stated that E.N. did not feed M.N. during visits. (Exhibit D to Appendix, Request for Services of 12/2/05).

48.     B.S. also stated that E.N. had not dress M.N. properly during visits. (Exhibit D to Appendix, Request for Services of 12/2/05).

49.     Upon review, it was determined that no allegations within the December 2, 2005 Request met the criteria for assessment of child abuse or neglect. (Exhibit D to Appendix, Request for Services of 12/2/05).

50.     On December 7, 2005, B.S. made another request for services to Somerset County CYS. (Exhibit E to Appendix, Request for Services of 12/7/05).

51.     The CYS referral by B.S. of December 7, 2005 was made due to a bruise that had appeared on M.N.'s chin while in the custody of E.N. (Exhibit E to Appendix, Request for Services of December 7, 2005;Exhibit F to Appendix, Deposition of B.S., pp. 116-117).

52.     The Request for Services also indicated that M.N. had multiple medical needs including the need for special foods. (Exhibit E to Appendix Request for Services of December 7, 2005).

53.     Following receipt of the referral, the matter was assigned to Somerset County CYS in-take worker, Jennifer Custer. (Exhibit G to Appendix, Custer Deposition, pp. 14-16)

54.     Pursuant to Somerset County CYS policy and the regulations of the Pennsylvania Department of Public Welfare, Jennifer Custer initiated an investigation. (Exhibit G to Appendix, Custer Deposition, p16).

55.     During her investigation, Ms. Custer met with B.S. and M.N. at B.S.'s home. (Exhibit G to Appendix, Custer Deposition, p. 16).

56. Ms. Custer also spoke with M.N.'s dietician and social worker at Children's Hospital. (Exhibit G to Appendix, Custer Deposition, pp. 22-23; 25-26).

57. Accordingly, Ms. Custer sought appropriate authorizations from B.S. to consult with M.N.'s physicians in order to determine the nature of the lack of weight gain of M.N. (Exhibit G to Appendix, Custer Deposition, p. 25).

58. Ultimately, the case remained in in-take for nearly four months. (Exhibit G to Appendix, Custer Deposition, p. 34).

59. During that time, no sufficient determination was made as to why M.N. was not gaining appropriate weight. (Exhibit G to Appendix, Custer Deposition, p. 34).

60. Because of the amount of time that had elapsed since the referral, it was decided to accept the matter for services on March 13, 2006. (Exhibit G to Appendix, Custer Deposition, p. 34; Exhibit H to Appendix, Case Assignment Details dated March 6, 2006).

61. Ms. Custer noted that, at the time of her investigation, M.N. was approximately 18 months old, yet weighed only 17 lbs. (Exhibit E to Appendix, Request for Services of December 7, 2005).

P0895921.1

62.     Ms. Custer conducted her assessment from the period of December 7, 2005, until March 16, 2006. ((Exhibit E to Appendix, Request for Services of December 7, 2005;Exhibit H to Appendix, Case Assignment Details dated March 6, 2006).

63.     Once the matter was accepted for services, it was transferred to the on-going unit of Somerset County CYS and, specifically, case worker, Jessica Eller. (Exhibit I to Appendix, Eller Deposition, pp. 12-14).

64.     When Ms. Eller received the file, she noted that there were concerns regarding M.N.'s weight. (Exhibit I to Appendix, Eller Deposition, p. 14).

65.     During Ms. Eller's handling of the matter, Dr. Lindblad advised Ms. Eller of his diagnosis of psychosocial failure to thrive and suspicion of Munchausen by Proxy of B.S. (Exhibit B to Appendix, Lindblad Deposition, p. 40-41).

66.     Dr. Lindblad asked personnel at CYS how to make a ChildLine report. (Exhibit B to Appendix, Lindblad Deposition, p. 161).

67.     Prior to discussing the manner of making the report with CYS, Dr. Lindblad had already decided to make the ChildLine report. (Exhibit B to Appendix, Lindblad Deposition, p. 162-3).

68. Dr. Lindblad is a required reporter under relevant Pennsylvania law as a treating physician. (Exhibit B to Appendix, Lindblad Deposition, p. 44).

69. Although Dr. Lindblad had indicated to Ms. Eller his intent to report this matter to ChildLine, he was unable to do so until the evening of May 4, 2006. (Exhibit B to Appendix, Lindblad Deposition, p. 38-9).

70. Dr. Lindblad made his report to ChildLine because of his belief that M.N. was at risk for continued problems based upon her failure to thrive and her undernourished status. (Exhibit B to Appendix, Lindblad Deposition, p. 67).

71. On May 5, 2006, Ms. Eller made a report to ChildLine based upon Dr. Lindblad's diagnosis of psycho-social failure to thrive of M.N.. (Exhibit I to Appendix, Eller Deposition, p. 22).

72. Ms. Eller's referral was based solely on the information she had received from Dr. Lindblad. (Exhibit I to Appendix, Eller Deposition, p. 108).

73. Based upon Ms. Eller's ChildLine call and the information received from Dr. Lindblad, Julie Barth, Ms. Eller's Supervisor, completed a request for services form to note the report of Dr. Lindblad. (Exhibit I to Appendix, Eller Deposition, pp. 27-28).

74. The request indicated that Dr. Lindblad had made a modified diagnosis of psycho-social failure to thrive due to B.S.'s actions. (Exhibit J to Appendix, Somerset County CYS Request for Services dated May 4, 2006).

75. Ms. Eller believed that the re-diagnosis of psycho-social failure to thrive constituted a life-threatening condition, justifying intervention. (Exhibit I to Appendix, Eller Deposition, pp. 29-30).

76. Prior to the transfer of custody, on April 7, 2006, Jessica Eller had been in contact with Tom Horave of Child Custody. (Exhibit I to Appendix, Eller Deposition, pp. 36; 109).

77. Ms. Eller was advised that Child Custody had done an assessment of the home of the natural father of M.N. and that there were no concerns for M.N. being at the home. (Exhibit I to Appendix, Eller Deposition, p. 37; 110).

78. The home study performed by Child Custody is similar to that done by CYS. Exhibit I to Appendix, Eller Deposition, p. 111).

79. Ms. Eller, along with Julie Barth, prepared a Summary and Order of Court to be presented on May 5, 2006. (Exhibit I to Appendix, Eller Deposition, p. 28; Exhibit K to Appendix, Summary and Order of Court dated May 5, 2006).

80. Ms. Eller originally took the Summary and Order to Judge Klementik of the Somerset County Court of Common Pleas but Judge Klementik could not proceed because B.S. had run his judicial campaign in her hometown of Berlin. (Exhibit I to Appendix, Eller Deposition, p. 37).

81. Ms. Eller then took the Summary and Order to Judge Cascio who reviewed it and signed the Order. (Exhibit I to Appendix, Eller Deposition, p. 38).

82. Ms. Eller and Ms. Barth decided that CYS need not take custody of M.N. because there was a viable parent other than the alleged perpetrator. (Exhibit I to Appendix, Eller Deposition, p. 33).

83. Accordingly, because a viable parent was available, M.N. was not deemed to be dependent and no dependency proceedings were instituted. (Exhibit L to Appendix, Transcript of Petition for Habeas Corpus proceedings, pp. 12-13).

84. The Order signed by Judge Cascio provided that all contact and visitation between B.S. and M.N. be supervised by Somerset County CYS. (Exhibit K to Appendix, Summary and Order of Court dated May 5, 2006).

85. The May 5, 2006 Order also provided that M.N. was to reside with her father, E.N. until the completion of the investigation. (Exhibit K to Appendix, Summary and Order of Court dated May 5, 2006).

86. On that date, Ms. Eller and another CYS employee accompanied police officers to the residence of B.S. to secure M.N. and to transfer custody to E.N. pursuant to the Order of Court.

87. On May 24, 2006, B.S. instituted habeas corpus proceedings with respect to the transfer of custody of M.N. to E.N. (Exhibit M, Petition for Writ of Habeas Corpus)

88. A hearing on the Petition for Writ of Habeas Corpus was held before Judge Cascio on June 14, 2006. (Exhibit N to Appendix, Order of June 26, 2006 disposing of Petition for Writ of Habeas Corpus)

89. Following hearing, which included testimony, the Petition for Writ of Habeas Corpus was denied by Judge Cascio. (Exhibit N to Appendix, Order of June 26, 2006 disposing of Petition for Writ of Habeas Corpus)

90. Judge Cascio specifically found that M.N. had not been taken into protective custody so as to trigger the provisions of the Child Protective Service Law. (Exhibit N to Appendix, Order of June 26, 2006 disposing of Petition for Writ of Habeas Corpus).

91. Judge Cascio also found that there was no basis in law or fact to determine that M.N. was dependent because E.N. was available to provide adequate care. (Exhibit N to Appendix, Order of June 26, 2006 disposing of Petition for Writ of Habeas Corpus).

92. Ultimately, Jessica Eller determined that that B.S. was "indicated" as a perpetrator of abuse and/or neglect of M.N. as that term is understood by Pennsylvania law. (Exhibit I to Appendix, Eller Deposition, p. 101).

93. On June 19, 2006, Julie Barth and Jessica Eller completed the CY-48 Child Protective Service Investigation Report which confirmed the finding of an "indicated" status of B.S. (Exhibit I to Appendix, Eller Deposition, pp. 61-62; Exhibit O, CY-48 form prepared by Ms. Eller and Ms. Barth).

94. The CY-48 form summarized the findings of the investigation conducted following the May 5, 2006 ChildLine report. ( Exhibit O, CY-48 form prepared by Ms. Eller and Ms. Barth).

95. On the CY-48 form, Ms. Eller stated that "As a result of these findings, B.S. has been indicated for physical neglect." (Exhibit I to Appendix, Eller Deposition, p. 62; Exhibit O,CY-48 form prepared by Ms. Eller and Ms. Barth).

96. Accordingly, on June 23, 2006, a second summary and order was presented to Judge Cascio which was signed. (Exhibit P to Appendix,Summary and Order of Court of June 23, 2006).

97. The Order of June 23, 2006 provided that due to the Indicated status of B.S. as the perpetrator of serious physical neglect of M.N., all visitation between B.S. and M.N. was to remain

supervised *until further hearings on the matter are scheduled by either parent.* (Exhibit P to Appendix, Summary and Order of Court of June 23, 2006, *emphasis added*).

98. On June 27, 2006, B.S. was advised by the Pennsylvania Department of Public Welfare of the finding of a status of Indicated. (Exhibit Q to Appendix, Notice of June 27, 2006 advising B.S. of "Indicated" status).

99. The notice advised that B.S. had the right to request that the Indicated report be amended or destroyed if it was believed that the report was inaccurate or being improperly maintained. (Exhibit Q to Appendix, Notice of June 27, 2006 advising B.S. of "Indicated" status).

100. B.S., through her counsel, David Chontos, Esq., requested that the information be expunged. (Exhibit R to Appendix, Letter of September 12, 2006 from Department of Public Welfare advising of receipt of request to expunge).

101. By correspondence of December 8, 2006, B.S. was advised that the request for expungement was denied. (Exhibit S to Appendix, Letter of December 8, 2006 from Department of Public Welfare advising of denial of request to expunge).

102. The notice of December 8, 2006 advised that B.S. had a right to a hearing before the Secretary of the Department of Public Welfare or the Bureau of Hearings and Appeals. Exhibit S

to Appendix, Letter of December 8, 2006 from Department of Public Welfare advising of denial of request to expunge).

103.   Although B.S. initiated proceedings to expunge the finding, by correspondence of January 21, 2008, that appeal was withdrawn by B.S.'s counsel. (Exhibit T to Appendix, Appellant's Notice of Withdrawal of Appeal of Child Abuse Expunction).

104.   While the above proceedings were transpiring, B.S. and E.N. were engaged in litigation concerning the custody of M.N. (Exhibit U to Appendix, Deposition of E.N., pp. 31-36)

105. Those custody proceedings are on-going and E.N. retains primary custody of M.N. today. (Exhibit F to Appendix, Deposition of B.S., pp. 268).

 

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.


By: s/Marie Milie Jones
    MARIE MILIE JONES, ESQUIRE
    PA I.D. #49711
    JEFFREY COHEN, ESQUIRE
    PA I.D. #76512

U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
Phone: (412) 261-6600
Fax: (412) 471-2754
E-Mail: mjones@mdbbe.com
        jcohen@mdbbe.com
*(Counsel for Defendants)*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been forwarded to all counsel of record by:

    _____ U.S. First Class Mail, Postage Paid

    _____ Hand Delivery

    _____ Certified Mail, Return Receipt Requested

    _____ Facsimile Transmittal

    _____ UPS Delivery

    __X__ Electronic Filing/Service

at the following address:

Edward A. Olds, Esquire
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
*(Counsel for Plaintiffs)*

MEYER, DARRAGH, BUCKLER,
BEBENEK & ECK, P.L.L.C.

Dated: March 15, 2010

s/Marie Milie Jones
MARIE MILIE JONES, ESQUIRE
JEFFREY COHEN, ESQUIRE

P0895921.1