IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRENDA BELSAR,                          )
      Plaintiff,                      )
                           )     Civil Action No. 3:08-v-00030
    vs.                                 )     Judge Nora Barry Fischer
                           )
SOMERSET COUNTY and SOMERSET           )
COUNTY CHILDREN AND YOUTH              )
SERVICES,                              )
      Defendants.                     )

## PLAINTIFF'S PETITION FOR AN AWARD OF LAWYERS' FEES PURSUANT TO 42 U.S.C. § 1988

Plaintiff submits the following in support of her Petition for Fees.

### Statement of the Case

1.  In May of 2006, Somerset County CYS removed Ms. Belsar's daughter from her home and placed the girl with her father. The action was sparked by a report of neglect filed by a pediatric gastroenterologist, who decided that Belsar's two year old daughter, a cancer survivor who had lost weight while undergoing chemo-therapy and subsequently failed to experience catch-up weight gain, though steadily moving up the growth chart, was a victim of neglect. The doctor had recently changed his diagnosis, and now attributed the girl's failure to thrive to psycho-social problems, and specifically identified Belsar as the perpetrator.

2.  The caseworkers, acting pursuant to Somerset County CYS custom and practice, secured an ex parte court order from a Somerset County Court of Common Pleas Judge authorizing them to remove Ms. Belsar's daughter from her custody and place the girl with her father. The ad hoc judicial procedure did not contemplate any hearing and, indeed, Ms. Belsar was never provided with a hearing.

3.   The removal of Ms. Belsar's daughter from her custody by Somerset County CYS caseworkers was the beginning of a six-year odyssey for Ms. Belsar.  It centered on the restoration of her daughter to her life and efforts to achieve justice for the unconstitutional action of Somerset County CYS.

4.   As for the restoration of her daughter to her life, the journey was torturous. For at least three years Ms. Belsar was limited to weekly, two-hour visits that were supervised. Ms. Belsar's custody action met with many delay tactics from the girl's father.  Eventually, Ms. Belsar gained split custody of her daughter and now they live together two weeks out of every four.

5.   The path leading to the present point in this litigation was equally rigorous.  It involved significant pre-complaint investigation, substantial discovery and cross motions for summary judgment.   Because allegations involved challenging a county-wide system of some age and persistence, significant due diligence was required in all aspects of the litigation.  The case also involved an appeal to the Third Circuit and pretrial preparation on remand, before making it back to its current status.

6.   Ms. Belsar filed a federal court action in January of 2008, and the case was assigned to Judge Gibson in Johnstown.   The action named Somerset County CYS and the two caseworkers involved in the removal of Ms. Belsar's daughter as defendants.  It alleged that these parties violated Ms. Belsar's procedural and substantive due process rights.

7.   In connection with the federal court action, the parties engaged in ADR, and participated in a neutral evaluation presided over by Judge Zeigler.  Judge Ziegler was unable to persuade the Defendant to negotiate, and the parties thereafter went down the discovery trail.

2

8.   There was fairly extensive discovery.  Belsar was deposed over the course of three days.  Her counsel took the deposition of 6 employees of the CYS, including several supervisory employees or administrative level employees.   Additionally, two physicians were deposed.   Because the facts surrounding the procedural due process claim were objective, Belsar served requests for admissions, seeking to establish those objective facts. Thousands of pages of caseworker notes and medical records had to be examined.[1] Additionally, Belsar employed an expert, Dr. Bradley Kessler to write a report suggesting that the taking was wrongful.  **(Exhibit 1)** Medical files and records had to be obtained, reviewed and pertinent ones had to be provided to the expert so that he could prepare a report, which was cited by the Third Circuit in its opinion.[2]

9.   After the completion of discovery, both parties moved for summary judgment. Ms. Belsar moved for summary judgment on the procedural due process claim.  Somerset County CYS presented a summary judgment motion challenging all of Ms. Belsar's claims. It raised arguments that there was no procedural due process violation, no substantive due process violation and that the individual caseworkers were either partially immune or absolutely immune by virtue of their role as caseworkers. Judge Gibson denied Ms. Belsar's motion and granted Somerset CYS's motion in its entirety.  An appeal to the Third Circuit followed.

10. In the appeal, Ms. Belsar continued to argue that she was entitled to summary judgment on procedural due process claims, and that Judge Gibson had been wrong in

---

[1] For instance, all of Belsar's daughter's medical records from Children's hospital were received at a cost of over $1,000.  These records had to be carefully examined to pin down all of the medical facts about the girl.

[2] The Circuit would cite the report as part of its rational for a remand on damages, as the report suggested that the taking had been wrongful.

entering the summary judgment in favor of Somerset County CYS on all the claims. The Third Circuit, in a published opinion, reversed Judge Gibson, in part, and determined that Ms. Belsar was entitled to summary judgment on liability for her procedural due process claim. *B.S. v Somerset County* CYS, 704 F3d 250 (3d Cir 2013). Attached as **Exhibit 2.** The majority opinion "agree[d] with Mother that her procedural due process rights were violated by the Appellees, though the individual defendants are protected by absolute immunity. " *B.S.* at 253 . Since Ms. Belsar had moved for Summary Judgment in the District Court on her procedural due process claims, the circuit "reverse[d] in part the District Court's order and... remand[ed] the case for a trial against the County on the damages Mother sustained when her procedural due process rights were violated." *Id.* Thus, It determined that Ms. Belsar was entitled to summary judgment on liability on her procedural due process claim.

11. Ms. Belsar then filed a motion for attorney's fees before the Third Circuit, pursuant to Local Rule. **(Exhibit 3)** The Circuit remanded the question of fees incurred in the appellate proceedings to the District Court. **(Exhibit 4)**

12. Judge Gibson recused himself following the Third Circuit remand. Judge Fischer was assigned the case. Thereafter, there were additional proceedings as the parties started preparing for trial. Settlement conferences occurred and Ms. Belsar filed a pretrial statement, as well as a trial brief addressing how damages were to be determined.

13. It was at this point that Somerset County CYS made an offer of judgment pursuant to Rule 68 Fed. R. Civ. Pro in the amount of $50,000. A copy of that Offer of Judgment is attached hereto as **Exhibit 5.** Ms. Belsar accepted the offer in a timely manner. **(Exhibit 6)** As the offer did not include costs, the question of the amount of attorney's fees and costs

due to Ms. Belsar under 42 U.S.C. §1988 remained open and a matter to be decided by this

Court. Hence, this fee petition is presented seeking an award of fees.

**Legal standards to be applied to this Fee Petition.**

> **Ms. Belsar is a prevailing party in this civil action, as the $50,000 offer of judgment she accepted is a judicial alteration of the parties' relationship.**

14.  The Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, as amended,

42 U.S.C. § 1988, provides in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 ..., or title VI of the Civil Rights Act of 1964 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

15. The Supreme Court has stated, "Congress intended to permit the ... award of counsel

fees only when a party has prevailed on the merits." *Hanrahan v. Hampton*, 446 U.S. 754,

758 (1980) (*per curiam*).  Parties are considered "prevailing parties" if "they succeed on

any significant issue in litigation which achieves some of the benefits the parties sought in

bringing suit." *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 271 (3d

Cir.2002) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433(1983)) (internal quotation

marks omitted).

16.  There are two factors relevant to the prevailing party inquiry: (1) whether there is a

"judicially sanctioned change in the legal relationship of the parties," *Buckhannon Board

and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532

U.S. 598, 603 (2001), that "achieves some of the benefit the part[y] sought in bringing

suit," *Hensley*, 461 U.S. at 433. (internal quotation marks and citation omitted), and (2)

whether the party "receive[s] at least some relief on the merits of his claims," *Buckhannon*,

532 U.S. at 604.  To "succeed" under this standard, a party must achieve a "court-ordered 'change in the legal relationship between the plaintiff and the defendant.' " *Buckhannon*, 532 U.S. at 604 (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)).

17.  The Third Circuit has expressly held that a Rule 68 Offer of Judgment entitles the accepting party to an award of fess and costs.  See *Lima v. Newark Police Department*, 658 F.3d 324, 331 (3d Cir. 2011).  ("In sum, a valid Rule 68 offer of judgment necessarily includes costs and attorney's fees either explicitly or implicitly. When the costs are stated explicitly in the offer of judgment, the offeror is not subject to any additional liability. When, however, the offer of judgment is silent as to fees and costs, they must be fixed by the court after the offer of judgment is accepted.")

18. Thus, it is now clear that, based upon the Defendants' offer of a $50,000.00 judgment pursuant to Rule 68, and Ms. Belsar's acceptance of that judgment, she is the prevailing party and entitled to an award of attorney's fees.  The case law addressing the issue of whether attorney's fees are awardable in situations where nominal fees are recovered, therefore, is not applicable.

### The Lodestar calculation should not be reduced significantly even though Ms. Belsar did not prevail on all of her claims.

19. The prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1 (1989)(quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)).

20. The Supreme Court has held that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983);

see also *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (same). The result of this computation is called the lodestar.

21. The lodestar is strongly presumed to yield a reasonable fee. *City of Burlington v. Dague*, 505 U.S. 557 (1992).

22. While Ms. Belsar did not prevail on all of her claims or against all of the parties, this result, however, should not lead to a significant reduction of the lodestar as is discussed below.[3] *Hensley* cautions that courts should not reduce fees simply because some of a prevailing party's related claims are unsuccessful. See *Hensley*, 461 U.S. at 434-35. For example, where a plaintiff's claims involve "a common core of facts" or are based on "related legal theories, ... [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435.

23. We do not dispute that when a party brings claims that do not depend on the same sets of facts and legal theories as the claims on which the party has succeeded, fees should not be awarded for work on those unrelated claims because the work "cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Hensley*, 461 U.S. at 435. (internal quotation marks omitted).[4]

---

[3] Ms. Belsar was unsuccessful on her claims against the individual caseworkers, as they were afforded absolute immunity, and generally unsuccessful on her substantive due process arguments. Similarly, she made a claim that Eller's June 23rd contact with Judge Cascio violated her procedural due process rights, a claim rejected by the majority by virtue of the award of absolute immunity, but which would have been recognized by the dissent.

[4] "Establishing relatedness on a claim-by-claim basis in the attorneys' fees context is a fact-intensive determination…" that is normally performed by the district court, due to its "'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" *McKenna v. City of Philadelphia*, 582 F.3d 447, 458 (3d Cir. 2009) (quoting *Hensley*, 461 U.S. at 437.)

24. In accordance with this principal, it is "established that the court can reduce the hours claimed by the number of hours spent litigating claims on which the party did not succeed *and that were distinct in all respects from claims on which the party did succeed.*" *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1044 (3d Cir. 1996) (internal quotations and citations omitted. Emphasis added.) However, it is important to keep in mind the admonition of the Supreme Court in *Hensley, where* the Supreme Court explained:

> Many civil rights cases will present only a single claims. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories....Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation.... [T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.
> *Hensley,* 461 U.S. at 435.

25. As noted above, Ms. Belsar was successful on her procedural due process claim challenging the May 5, 2006 removal of her daughter. The claims on which she failed to prevail, are not "distinct in all respects from the claims on which" she prevailed. Id. Therefore there should not be a significant reduction in the lodestar. She had significant overall success, not only in the sense of securing a judgment, but also in her efforts to expose an unconstitutional practice sponsored by an important governmental agency, which was apparently not checked by the courts. This was a significant case, in that regard.

26. The instruction not to see the action as a series of discrete claims becomes even more important, when one looks at the case from a larger perspective. A simple factual narrative will set that stage.

8

- Belsar's daughter, who was diagnosed as suffering from cancer a few days before she as born, underwent surgery on the third day of her life, and then experienced a period of chemotherapy, until she was about 5 months old.

- Her daughter lost weight after the chemotherapy, and failed to experience catch-up growth.

- From October 2005 through April 2006, Belsar drove her daughter to Children's Hospital every 8 weeks, so that her daughter could be treated by a specialist, Dr. Douglas Lindblad.

- After following the case for 6 months, and after Belsar's daughter was treated as an inpatient at the Children's Institute for a week, Dr. Lindblad decided that the girl was not experiencing catch-up growth, because of some unspecified problem with her mother. On April 18th, 2006, he changed his working diagnosis to psycho-social failure to thrive.

- Lindblad last saw the daughter on April 18 , 2006.   He did not make a Childline report at that time.

- Belsar took her daughter to the Children's Institute a few days later, and Dr. Gage discharged her from treatment, noting improvement.

- A few days later, the daughter was also examined by another specialist,  Dr. Chandra, who changed the daughter's medication.  Neither Chandra nor Dr. Gagesaw any need to file a Childline report.

- Jessica Eller contacted Dr. Lindblad by phone on May 4th or 5th, and instructed Lindblad to file a Childline report.  Unwilling to wait for Lindblad to make the call, Eller made a report to Childline, herself.

- Eller's self-initiated report kicked the custom and practice of removing Belsar's daughter without a hearing.  She secured an *ex parte* court order authorizing the removal of the girl and served the order on the same day. Belsar's daughter was removed on May 5, 2006, based on Lindblad's examination from 18 days earlier.

- As it turned out, Eller first step after removing Belsar's daughter was to take her to her pediatrician for an examination.  The girl was weighed, and she showed substantial weight gain.  A diagnosis of failure to thrive is dependent on objective factors- - a child's weight in relation to their age.  In fact, the weight registered at that appointment was such that Belsar's daughter was no longer in the third percentile of the growth chart, the cutoff for a failure to thrive diagnosis, so the April 18th diagnosis was no longer valid..

- Belsar's daughter was examined again three days later and she registered the same weight she had on May 5th.

- As the sole reason for removing Belsar's daughter was the allegation of psycho-social failure to thrive, and her May 5th and May 8th weights took her out of the failure to thrive category, a substantial question was presented about whether Belsar's daughter should have been removed.

- This question of whether she should have been removed would not be broached in any judicial proceeding however, because Belsar was not given any hearing.

- Belsar did not learn about the May 5th and May 8th weigh-ins, until she received the record of these events in connection with the expunction proceeding she would bring to remove the "indicated finding of neglect" the next year.

- As it turned out, Eller had further ex parte communications with the common pleas court judges, in which she shared her findings of neglect. She failed to provide information about the May 5th and May 8th weigh-ins and their implications in those meetings.

- Belsar started a habeas corpus proceeding after her daughter was removed, but CYS defended against that proceeding claiming that it never had "custody" of her daughter.

- One of Eller's ex parte contacts occurred after the hearing on the habeas petition, but before the Judge rendered a decision. Belsar claimed that Eller kept vital information from the Judge in this *ex parte* proceeding.

27. Belsar's federal court complaint, and the ensuing litigation focused on these events. Ms. Belsar presented two legal claims -- a claim that she had been denied procedural due process, and a claim that she had been denied substantive due process. There was substantial overlap between the object of proof in both claims, but, the procedural due process claim always was the central thrust of Ms. Belsar's action. It was the claim on which Ms. Belsar moved for partial summary judgment, the claim which was explored in the depositions of the Somerset County CYS employees and supervisors

28.   In fact, her litigation goal was to establish that the failure to afford her a hearing deprived her of procedural due process and resulted in the wrongful removal of her daughter .   However, in order to establish all of the elements of that claim, including the facts that   would support a damage claim, Belsar had to concern herself with all aspects of the interaction between her and Somerset County CYS.   This is because her ability to seek money damages for the denial of procedural due process relied on her ability to establish that had she been given a hearing, her daughter would have been returned to her. See *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (Holding that a plaintiff asserting a procedural due process claim under § 1983 must introduce proof of damages arising from the alleged due process violation in order to recover actual damages). Consequently, Belsar would, in essence, have to prove that the loss of her daughter was wrongful, if she was to recover damages for the procedural due process violation.

29.   The Third Circuit has decided at least two cases which apply *Carey v Pyphus,*   and have addressed the damages and burden of proof issues involved in trials in cases where the plaintiff has successfully established that she has been denied procedural due process. *See, Polk v Alexander,* 750 F.2d 250 (3d Cir 1984) and *Fraternal Order of Police Lodge NO. 5 v Tucker,* 868 F.2d 74 (3d Cir 1989).   The cases teach several important matters with respect to damages, and highlight why the loss of certain legal issues does not minimize the amount of factual issues that must be presented at trial.

30. First, the jury would have had to decide whether the underlying taking was wrongful or, in other words, whether that taking would have been undone if a constitutionally adequate hearing had followed.   Second, if the jury would decide that a hearing would have made a difference and would have prevented a wrongful taking, Ms. Belsar would have

been entitled to damages for all of the injuries that were consequential to or associated with the loss that would have been averted by a hearing.

31. Therefore, , in order for a jury to award damages for the deprivation of procedural due process, which permits a wrongful taking of a child, the plaintiff must establish that the taking was wrongful or unjustified and that a hearing would have prevented the taking. In *Fraternal Order of Police,* 868 F2d at 81, the court outlined the issue. "[T]he district court will have to determine whether plaintiffs would have been discharged even if they had been informed of facts giving rise to the reasonable suspicion and had been given an opportunity to explain or refute those facts." In other words, relief for the loss of a protected interest is dependent on showing that "with such an opportunity [for a hearing], the result would have been different." Id. A substantive due process claim would focus on the same loss, albeit, the Plaintiff would have a higher burden of meeting the shocks the conscious test. *Miller v. City of Philadelphia*, 174 F.3d 368 (3d Cir.1999), (A substantive due process claim requires "decision-making by a social worker that is so clearly arbitrary ... [that it] can properly be said to 'shock the conscience.' " Id. at 376;)

32. Stated another way, the damages which flow from the loss of custody and companionship of a daughter, whether caused by a substantive due process violation or procedural due process violation are determined by related factual issues - -what are the circumstances leading to the loss. In a substantive due process case, the question is whether the conduct of the Defendant shocks the conscious. In a procedural due process case, it whether the defendant's conduct caused a wrongful deprivation, not corrected by the requisite procedural due process. When the injury is the wrongful taking of a child, there is

not a chasm between the damage consequences of a substantive or procedural due process violation.

33. Therefore, there is a "common core" of facts between the claims on which Ms. Belsar prevailed and on those she lost. That "common core" involved the question of whether Ms. Belsar could establish actual injury resulting from the constitutional deprivation inflicted on her. In order to establish a claim for damages a substantive due process claim, Belsar would have to establish the taking shocked the conscious. In order to secure damages for a procedural due process violation, Belsar would have to prove that the taking was wrongful or not justified, and would have been reversed at a hearing. The evidence necessary to establish one or the other is for all intents and purposes the same. Only the degree of wrongfulness is different.

34. An example from the record will demonstrate the completely intertwined nature of the claims. Belsar claimed that Eller's June 23rd, 2006 ex parte contact with Judge Cascio amounted to a substantive and procedural due process violation. The majority opinion was willing to concede that a claim might have been stated, but for the awarding of absolute immunity.[5] The dissent would have denied absolute immunity and qualified immunity for Eller for this conduct and awarded a judgment in a nominal amount based upon a

---

[5] Specifically, the court noted that
> We reach this issue with regard to this claim, unlike with the claim arising from Eller's May 5 conduct, because Mother has a much stronger case that her substantive due process rights were violated by Eller's subsequent actions. Eller's failure to mention the May 5 and May 8 weigh-ins in her report, combined with evidence in the record that she had a contentious relationship with Mother (*see* Joint App. at 310 (describing how Eller found Mother "very offensive from the beginning of [their] relationship")), could potentially, upon further analysis, support a determination that a rational jury might conclude that her behavior shocked the conscience.
> B.S. 704 At 269, fn 29

procedural due process violation associated with the incident. Id. 704 F3d 282-283. However, even though the Third Circuit denied the right to assert a separate claim for that incident to Belsar, the incident itself would be relevant to the central question of damages, demonstrating that time spent flushing out the conduct was not wasted. Eller's act of withholding evidence from Judge Casio regarding the girl's weight on the day of the removal, and Eller's alteration of medical records are facts from which a jury could infer that May 5th weight negated the reason for the removal.

35. Consequently, the vast majority of the legal activity associated with prosecuting the claims against the individual caseworkers and advancing the substantive due process claim involve the same "core issues" as presented by the procedural due process claims, and would have been necessary even if the only claim presented had been the procedural due process claim.[6]

36. It is now appropriate to proceed to an analysis of the specific activity of Belsar's counsel.

## STATEMENT OF THE FACTS SUPPORTING REQUEST FOR ATTORNEYS' FEES

### Pre-litigation investigation of claims [7]

37. Ms. Belsar met with Attorney Edward Olds about a year after her daughter had been removed. She explained that there had been a report of child neglect filed against her,

---

[6] Ms. Belsar's counsel have already reduced their hours recorded in the application for fees directed to the Third Circuit so as to exclude activities that pertained exclusively to the unsuccessful claims, which could be severed from work asscociated with the procedural due process claim. The time spent on other matters is highlighted in the billing with the use of italics.

[7] Since this court did not preside over this case until after the remand, it seems that time and effort must be taken to describe the case so that the Court can approach the fee dispute with the type of understanding that would have been achieved if the court had the case from the beginning.

which was based upon her daughter's failure to thrive. Ms. Belsar also related that her daughter had been removed from her home pursuant to an ex *parte* court procedure.

38. At the time of the meeting, Ms. Belsar was involved in a state court administrative proceeding, pending before the Pennsylvania Department of Public Welfare (DPW), which was intended to have the indicated neglect finding expunged. She was representing herself in that proceeding. Following this meeting, Olds was hired to help Ms. Belsar regain custody of her daughter and to represent Ms. Belsar in conjunction with the DPW expunction hearing.[8] Ms. Belsar also sought an examination of her situation to determine whether it would be appropriate to initiate a federal court action challenging the removal of her daughter.

39. It was agreed that Olds would undertake all three tasks, but that the question of whether to pursue a federal court action would be dependent on the information gathered while Olds represented Ms. Belsar in the expunction proceeding. In other words, Olds participation in the expunction proceeding would serve the purpose of due diligence in deciding whether there was a constitutional violation, and if so, file a federal court action on her behalf.

40. Pursuit of the expunction proceeding was not a luxury. Instead, it constituted a vital step in counsel's securing an understanding of the events that had had such a dramatic effect on Ms. Belsar's life. The necessity of pursuing the expunction action as a means of

---

[8] In addition to taking the steps to remove her daughter from her home, the Somerset County CYS caseworkers opened up a case under Pennsylvania's Child Protective Services Act. (CPSL) 23 Pa. Cons.Stat. Ann. § 6313(a) Eventually, Caseworker Jessica Eller made an a determination that the accusations of neglect were "indicated." Belsar had appeal rights from this finding, and lodged such an appeal. The CPSL provides that an appeal will be heard by a DPW ALJ. It was in the context of that proceeding that Olds and Belsar met, and which initially occupied Olds and Matesic.

investigating Ms. Belsar's constitutional claims resulted from the confluence of several factors.

41. First, although the circumstances that led to Ms. Belsar losing her daughter were completely intertwined with a legal proceeding, that proceeding left virtually no tracks chronicling what had occurred.

42. Due to the absence of any rules governing the ad hoc procedures employed by Somerset County CYS to manipulate which parent had custody of a child, Ms. Belsar had never been served with pleadings or any notices describing the proceedings or her rights concerning a response to the Somerset County CYS's action in removing her daughter. There were no local rules, standing orders, etc., outlining the procedure that had been used by the caseworkers.  Similarly, there was no statutory basis for the actions of Somerset County CYS, nor were there any rules or enactments that defined the criteria which CYS would employ to determine whether to remove a child.  Hence, there were difficulties even reconstructing how the taking had occurred.

43. Ms. Belsar initiated a habeas corpus proceeding in Somerset County shortly after the removal of her daughter, but Somerset County CYS had defended against that proceeding by asserting that it had never taken custody of Ms. Belsar's daughter.  The position taken by Somerset County CYS in that proceeding actually obscured, rather than elucidated, the events and their legal significance.  There was great tension between what appeared to have happened and Somerset County CYS's position about what had happened. Ms. Belsar saw a caseworker enter her house and remove her child.   While admitting to

that action, Somerset County CYS contended that Ms. Belsar's daughter was not in its custody, merely its possession.[9]

44. The second reason that the expunction proceeding provided the best path towards understanding the case concerns the nature of the basic factual issue.   That issue involved the reasons Ms. Belsar's daughter was not experiencing catch-up growth after being treated for cancer.  The evidence was in the possession of the four physicians who had examined and treated the girl in the months and days before and after her removal.

45.  Ms. Belsar's daughter had been removed following a phone conversation between a pediatric gastroenterologist, Dr. Lindblad, and Eller. .  During that conversation, Dr. Lindblad stated that he thought that Ms. Belsar's daughter was suffering from failure to thrive because of Ms. Belsar.

46. Lindblad, however, was not the only physician involved in treating Ms. Belsar's daughter.  Ms. Belsar admitted her daughter to the Pittsburgh Children's Institute about 6 weeks before Somerset County CYS removed her, and the girl was also being treated by local pediatricians.  Additionally, Ms. Belsar had taken her daughter to Dr. Chandra for a second opinion in between the time when Lindblad last examined her and the day she was removed.  Hence, extensive investigation into the girl's medical condition was required.

---

[9] The course of the habeas corpus proceeding, including Eller's ex parte contact with Judge Cascio was discussed by the Third Circuit.  It observed that "Judge Cascio entered an order denying Mother's habeas corpus petition saying, among other things, that '[t]he child was not taken into protective custody so as to trigger the provisions and protections of th' CPSL; and that '[p]lacement of the child with her Father is necessary and appropriate considering the serious and continuing medical evidence of failure of the child to thrive while in Mother's care.' (*Id.* at 714–15.)" *B.S. v. Somerset Cnty.*, 704 F.3d 250, 259 (3d Cir. 2013)

47. The expunction proceeding proved to be the best gateway to information on both as to the nature of the proceedings that were utilized by Somerset County CYS to effectuate the removal, and the medical evidence that would be crucial to the ultimate disposition of the case.

48. Prior to the expunction hearing, Ms. Belsar was completely shut off from vital information about the removal and the actions of Somerset County CYS. She did not have access to medical records generated when Somerset County CYS caseworkers removed her daughter. She did not know the contents of the neglect report. She did not know that on the day of the removal the weight gain recorded at Berlin Pediatrics suggested that her daughter might not be suffering from psycho-social failure to thrive and that she apparently experience significant catch-up growth. Instead, this evidence was embedded in the documentary evidence that Somerset County CYS was required to turn over to her in connection with the expunction proceeding.

49. An ALJ was appointed and a hearing on Ms. Belsar's expunction matter was scheduled. The hours that we present to the Court include time that we spent at that proceeding.

50. Ms. Belsar's counsel used the proceedings as a means of investigating what had happened to Ms. Belsar, and the proceedings consequently served as part of the due diligence to determine whether the federal court case should be filed. In other words, her counsel attended one hearing, employed subpoenas and medical releases to secure medical records and eventually cross-examined Jessica Eller, the principal caseworker and Dr. Gage from the Children's Institute was also examined. The core documents were reviewed, and it was possible, at that point to state for a certainty what had happened. Based on the

18

investigation conducted counsel determined that Ms. Belsar did have the basis for asserting a constitutional claim.

51. Olds spent approximately 35 hours related to the expunction hearing. This time includes procedural matters such as corresponding with the client and opposing counsel and the Department of Public Welfare, drafting subpoenas and records releases, reviewing records and prepping witnesses, as well as preparing for the hearing and conducting the hearing. As noted, the expunction proceeding also provided the necessary forum to conduct pre-complaint investigation into Ms. Belsar's claims. In that regard, Olds spent approximately 48 hours examining other evidentiary items, and reviewing applicable due process cases and Pennsylvania statutes.

52. Mr. Matesic spent 38 hours in connection with the expunction proceeding. His time included the following activities: reviewing the medical documentation, communicating with medical professionals, drafting outlines for the hearing, attending the hearing, questioning the witnesses, and participating in the decision to withdraw the expunction proceeding.

53. Based on the conclusion derived from this work that there was a viable federal constitutional claim, Ms. Belsar dismissed the expunction appeal, before a final determination was made. The decision was strategic. Counsel was concerned that if there was an unfavorable decision by the ALJ, that such a decision could lead to either a claims or issue preclusion defense to the upcoming federal court case. On the other hand, there is no exhaustion requirement prior to commencing a Section 1983 claim. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 507, 102 S. Ct. 2557, 2563, 73 L. Ed. 2d 172 (1982)

("[E]xhaustion of state administrative remedies is not a prerequisite to an action under §
1983.")

54.  In essence, the time related to the expunction proceeding, was time that had to be
spent investigating Ms. Belsar's constitutional claims.  Had the activities not occurred in
connection with the expunction proceeding, they would have occurred under some other
guise.

55.  The mere fact that the time was spent in connection with another proceeding is
certainly not dispositive of the question of whether fees can be sought for the activity.  In
the case of *Keenan v. City of Philadelphia,* 983 F.2d 459, 474 (3d Cir. 1992), the Third
Circuit determined that it was appropriate to allow fees where the product of the discovery
in the ancillary proceeding was later used in the federal court action.  *Keenan* involved an
award of fees for hours spent at an arbitration hearing.  *Keenan* determined that an award
for that proceeding would be proper since "the district judge specifically found that
'[t[ranscripts of arbitration testimony were used at trial and served the purpose of discovery
in this case.  Further, the arbitrator's decision was read to the jury and constituted favorable
evidence for the plaintiffs at trial.'"  *Id.*

### The federal court action- -Complaint/ Amended Complaint and preliminary litigation.

56. Ms. Belsar commenced this action claiming she was denied procedural and
substantive due process by Somerset County CYS.  Also sued were two caseworkers in
their individual capacity.  Initially, Ms. Belsar also joined her daughter's father, but that
individual was dismissed from the case after his deposition was taken.  Mr. Olds spent
approximately 16.5 hours drafting and revising the federal court complaint and other
initiating documents such as the waiver of service.  Mr. Olds spent approximately 45.5

hours on court filings that occurred prior to or in conjunction with the inception of the discovery process. These filings were required regardless of the number of claims presented, and would have occurred even if the procedural due process claim was the only claim presented. Specifically, these activities included reviewing the motion to dismiss and answer, drafting an amended complaint, drafting the 26(f) report of the parties, the initial disclosures and supplements thereto. Included within this time was preparation for and attendance at the ADR session, several motions for enlargement, and responding to motions to quash and/or motions for protective orders.

57. As required by the rules, that parties participated in the ADR process. In this case, the parties selected Donald Ziegler to conduct a neutral evaluation. Counsel had to prepare a position paper for the proceeding, and attend the proceeding. This activity is included in the total of 45 hours spent in this phase of the litigation.

### The federal court action- - discovery phase

58. Ms. Belsar's discovery efforts focused on the general theory that she suffered a procedural due process violation and that the taking of her daughter was wrongful. Olds's billing shows that approximately 158 hours of time was spent in the phase of the case associated with discovery. This time includes approximately 11 hours communicating with and hiring an expert, who would support the theory that taking of Belsar's daughter was wrongful. The expert was Dr. Bradley Kessler, who prepared a report (**Exhibit 1**) and who was prepared to provide trial testimony. Dr. Kessler's opinion was mentioned in the majority opinion of the Third Circuit as one element of the evidence that supported the remand of the case for trial. B.S. at 273, 274.

59. The hours presented also include Mr. Olds' efforts draft interrogatories, document requests, and requests for admissions; as well as providing responses to the Defendants' discovery requests.   It also includes time spent corresponding with opposing counsel regarding the progression of discovery, drafting subpoenas and reviewing documents.

60. Olds and Matesic, who was assisting Olds at the time, participated in 12 depositions. Matesic took the depositions of two of the doctors, Dr. Lindblad and Dr. Singh, the treating pediatrician.  Singh's testimony about the office practice of Berlin Pediatrics to weigh children with all clothes removed was evidence that demonstrated a factual dispute about Belsar's daughter's weight on May 5th, and hence supported the majority's decision to remand for a trial on damages. Id. at fn 34. The Circuit also noted Dr. Lindblad's deposition testimony attesting to the significance of the weight gain registered by the May 5th weigh-in. Id. at 274.  Olds and Matesic conferred about the goals of these depositions, because Olds possessed the familiarity with the documents of the CYS record, as well as medical records.  These conferences involved 3.6 hours by Matesic and 3.15 hours by Olds, and the importance of Lindblad's testimony about whether Belsar's daughter should be removed cannot be gainsaid.[10]

61. Olds took the deposition of 6 CYS employees, including the supervisory and administrative level employees.  The preparation for these depositions included reviewing of approximately 2500 pages of caseworker notes, as well as transcripts, legal pleadings and miscellaneous records.  The preparation time needed to actually take the deposition, and the depositions themselves, involved about 51.25 hours of Olds' time.

---

[10] Matesic recorded two short conferences that Olds did not record in his time log.

62.  Olds also prepared and served other discovery requests on the Defendants, including requests for admissions, whose purpose was to provide unambiguous evidence and secure admissions that Somerset County CYS actually had a custom or practice of denying parents procedural due process when abuse or neglect reports were filed under the Pennsylvania Child Protective Services Law. (Admissions and Reponses attached as **Exhibit 7**)  14.75 hours were spent crafting the Requests for Admissions, which were used extensively in Belsar's ultimately successful Motion for Summary Judgment Motion on Procedural Due Process Claim.

### The federal court action- - summary judgment phase

63. Olds spent approximately 47 hours preparing Belsar's partial summary judgment motion, which included an entire array of necessary filings, including briefs, a summary judgment record and a Concise Statement of Fact not in Dispute.  The Reply brief to the Defendant's response, which represented 21.6 hours heavily focused on the procedural due process issue.  Again, much of the time associated with defending against the summary judgment motion of the Defendant (39.8 hours) was time specifically associated with arguing the merits of the procedural due process claim.  Other issues addressed in the summary judgment motions, responses and associated pleadings and briefs addressed general litigation matters.

64. Throughout this phase of the litigation, Olds was a sole practitioner.  He employed Rebecca Olds, who was attending Duquesne University Law School at the time as a paralegal and Joann Matoka as an administrative assistant.  Each of these individuals performed substantial clerical and paralegal type work through the discovery and summary judgment phase of the lawsuit.  Matoka would have performed much of the work associated

with the pleadings for deposition notices, etc. and Rebecca Olds performed paralegal work involved in compiling the record for summary judgment and the appeal. Hence Rebecca Olds would have helped with citations in the material statements of fact and gathering the exhibits to the motions. Rebecca Olds and Matoka did not keep track of time, and their services are part of Olds overhead.

### Appeal to the Third Circuit

65. This court also must decide the fees for time spent by Olds and Jaimie George, his associate, on appeal   A fee petition was filed with the Third Circuit (**Exhibit** 3) In the fee Petition, Olds identified certain hours attributable to time defending the substantive due process claims and immunity claims, and deducted those hours. The appellate briefs Olds submitted to the Third Circuit are attached as **Exhibits** 8 and 9, so that the Court may examine their content to determine the quality of the work, and understand the amount of time that was required to assemble and present the arguments. Mr. Olds spent approximately 221 hours on the appeal to the Third Circuit. The appellate hours include the time Mr. Olds spent reviewing the District Court's Memorandum opinion and filing the appeal to the Third Circuit (12.3 hours), writing the appellant brief and creating the appendix (75 hours)[11], reviewing and replying to the appellee's brief (35.2 hours), researching and briefing the Rooker-Feldman issue (14.7 hours), preparing for and attending the oral argument (30.2 hours), reviewing the Third Circuit opinion and considering motion for rehearing (22.8 hours) and drafting the fee petition and reply to Defendants' brief in opposition(31.8 hours).

---

[11] The 75 hours reflects a discounted accounting of hours, as it excludes 14.6 hours that Mr. Olds attributed to the unsuccessful arguments on immunity and substantive due process.

66. Attorney Jaimie George started working for Olds in 2009 and became involved in the case after it was appealed to the Third Circuit. Ms. George spent approximately 75 hours[12] working on the appeal to the Third Circuit. In this capacity, she located cites to the record, edited, proofread, revised and corrected the factual and legal arguments to the appellate brief and reply, prepared the reproduced record, researched the Rooker-Feldman issue, prepared outlines for the oral argument and made revisions to the fee petition.

67. The legal arguments presented to the Circuit were started from scratch, in a sense, because they were tailored to argue the error of the District Court. Their preparation took significant time. Olds did not merely recite the same arguments from the District Court pleadings, but, rather, fashioned a brief designed to highlight in a stark and arresting manner the errors of the district court. In an effort to ensure that the Circuit would give the closest consideration to the case, Olds spent significant time crafting a document that would resonate with a need for a reversal of the district court.

**The federal court action- - remand phase**

68. After the case was remanded to the District Court to determine the amount of damages Ms. Belsar was entitled to for the violation of her procedural due process right, Mr. Olds expended an additional 105 hours. This time was dedicated to attending several conferences, reviewing the file, preparing a position statement for and attending a settlement conference, drafting a pretrial brief on damages, creating witness and exhibit lists for the trial, working on a timeline which was submitted to the court, working on the pretrial statement and researching the implications of accepting a Rule 68 offer of

---

12 The figure of 75 hours reflects a discounted accounting of hours, as it excludes 27.6 hours that were duplicative of work completed by Mr. Olds or was attributed to the unsuccessful arguments on immunity and substantive due process.

judgment.  Thereafter additional time was spent in an effort to settle the attorneys fee claim, including a settlement conference with Judge Mitchell.

69.  After the remand, a decision was made to enlist Tim O'Brien to be lead counsel at trial, and O'Brien spent 25.2 hours in this role.  Ms. George was also involved in the case following the remand to the District Court.  In that capacity, Ms. George spent 23.2 hours working on the position statement, identifying and listing witnesses and exhibits for the pretrial statement and also drafting the pretrial narrative.

**THE HOURLY RATES OF COUNSEL**

70.   The matter of an attorney's marketplace billing rate is a factual question which is subject to a clearly erroneous standard of review.  *Washington v. Philadelphia Cnty. Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)  The general rule is that a reasonable hourly rate is calculated according to the prevailing market rates in the community. *Blum v. Stenson*, 465 U.S. 886, 895-96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984); *Student Public Interest Research Group, Inc.*, 842 F.2d at 1448 (adopting the community market rule). The prevailing party bears the burden of establishing by way of satisfactory evidence, "in addition to [the] attorney's own affidavits," *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11, that the requested hourly rates meet this standard.  Id. at 1035

71. The lawyers seek the following hourly rates:

| | |
|---|---|
| Olds | $425 |
| Matesic | $325 |
| George | $175 |
| O'Brien | $525 |

72. The reasonableness of the rates, and the fact that the rates are reflective of  rates charged by lawyers of comparable experience and skill are addressed by the affidavits/declarations of the attorneys.  (**Exhibits 10-13**)  These hourly rates are also

supported by the affidavits of James W. Carroll, Jr., and John Stember.  **(Exhibits 14 and 15)**

73. These hourly rates also fit into the scale or range of fees as published by Community Legal Services.  **(Exhibit 16)**

74. As affidavits concerning the reasonableness of the fees have been presented, a prima facie case for the reasonableness and appropriateness of the hourly rates has been established.   The fee award should reflect an award for the hours spent by counsel multiplied by their hourly rate.

Wherefore, Plaintiff requests that the Court award the following fees as requested by this Petition:

O'Brien  $525 x 25.20 = $13,230
George*  $175 x 100 = $17,500
Matesic $325 x 77.9 = $25,317.50
Olds*  $425 x 716.5 = $304,512.50

Grand Total = $360,560.00

* Attorneys Olds and George will provide supplemental hours to reflect the time spent on the fee petition.

Respectfully submitted,

s/Edward A. Olds
Edward A. Olds, Esquire
PA Id # 23601
1007 Mount Royal Blvd.
Pittsburgh, PA 15223
(412) 492-8975

s/James B. Lieber
James B. Lieber
PA I.D. No. 21748
Lieber, Hammer, Huber, & Bennington, P.C.
5528 Walnut Street
Pittsburgh, PA 15232
(412) 687-2231 (tel.)

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was

filed electronically.  Notice of this filing will be sent by operation of the ECF system to

all counsel of record.  Parties may access this filing through the Court's ECF system.


/s/ Edward A. Olds
Edward A. Olds

1007 Mount Royal Blvd.
Pittsburgh, PA 15223
(412) 492-8975
(412) 492-8978 (fax)